**WO**

1
2
3
4
5

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Rena D. Cook,                    )
                                 )        No. CV-08-636-TUC-DTF
        Plaintiff,               )
                                 )        **ORDER**
vs.                              )
                                 )
Michael J. Astrue, Commissioner of )
the Social Security Administration, )
                                 )
        Defendant.               )
_____)

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision by the Commissioner of Social Security (Commissioner). The parties consented to exercise of jurisdiction by a Magistrate Judge, pursuant to 28 U.S.C. § 636(c)(1). (Dkt. 13.) This case presents the following issues on appeal: whether the Administrative Law Judge (ALJ) made inconsistent findings regarding Plaintiff's residual functional capacity (RFC), whether the ALJ made improper credibility and RFC findings based on erroneous conclusions regarding muscle atrophy and fibromyalgia, whether the ALJ improperly rejected lay witness statements, whether the ALJ improperly rejected the opinions of a treating doctor and a consulting examining doctor, and whether the ALJ's decision that Plaintiff could perform her past relevant work was supported by substantial evidence. Based on the pleadings and the record, the Court finds Plaintiff is not entitled to relief.

## PROCEDURAL HISTORY

Plaintiff filed an application for Social Security disability insurance benefits (DIB) and supplemental security income (SSI) in February 2005. (Administrative Record (AR) 131-33.) Plaintiff alleges disability from January 14, 2005, to the present. (AR 131.) After

Plaintiff's applications were denied, she appealed the denials and appeared and testified before ALJ Milan M. Dostal on January 23, 2007. (AR 55-98.) Subsequent to the hearing, the ALJ found Plaintiff was not disabled at step four of the analysis because she could perform past relevant work. (AR 24-35.) The Appeals Council denied Plaintiff's request to review the ALJ's decision. (AR 5-8.)

## FACTUAL HISTORY

Plaintiff was born on May 15, 1952, making her 53 years of age at the time she filed her DIB and SSI applications.[1] (AR 131.) In 1994, Plaintiff completed a bachelor's degree in special education and rehabilitation. (AR 225.) From October 1997 to August 2001, Plaintiff worked for the corrections system, initially as a correctional officer and then as a counselor from 1998 to 2001. (AR 210.) Plaintiff had a diskectomy and fusion of two discs in May 1999 (AR 425, 539-44) and missed three months of work (AR 219). She stopped working in the corrections system in August 2001, after a breakdown due to stress and pain. (AR 219.) Plaintiff was put on medical leave without pay until ready for full-time duty; she did not return to that job. (AR 499.) In January 2002, Plaintiff was in a car accident, which caused her existing symptoms to worsen and new symptoms to develop. (*Id.*) On April 22, 2002, neurologist David Siegel noted that Plaintiff had been released to work and her symptoms had been improved and she was "returning to baseline prior [to] that accident." (AR 425.) Dr. Siegel opined that she should not work in a corrections setting requiring inmate restraint, nor should she lift above shoulder level, do long marches, surveillance, or hiking on rough terrain. (*Id.*)

In 2002 and 2003, Plaintiff worked as a part-time volunteer with Americorps at the Little Colorado Behavioral Health Center. (AR 129-30.) During that time, she completed

---

[1]     The record reveals previous DIB and SSI applications dated March 28, 2002, and November 12, 2003, alleging an inability to work beginning in August 2001. (AR 117-121, 136-39.) The application(s) was denied at an initial stage. (AR 122-25.) The Court does not rely on the records related to the prior application(s) other than for background information or as cited by the parties.

the requirements and passed the state examination to become a licensed substance abuse counselor. (AR 130.) From January 2004 to January 2005, Plaintiff worked as a substance abuse counselor for a non-profit. (AR 176.) Plaintiff stopped working on January 14, 2005. (AR 131.)

Physical History

From March 2004 to August 2005, Plaintiff was seen at the Marana Health Center by Family Nurse Practitioners, Deborah Hanks and Rachel Cotton. (AR 249-71.) On March 1, 2004, Plaintiff was first seen by Hanks and complained of pain between her shoulder blades and in her neck, and that her body would fall asleep. (AR 381.) Plaintiff was observed to be in obvious discomfort from neck pain, she was given a prescription for Tylenol #3 and referred for an MRI. (AR 382-83.) At that time, she was taking Effexor for depression, which was continued. (AR 382.) On March 24, Plaintiff described her neck pain as being a 9 out of 10 and stated that she had pain and numbness in various body parts and it was hard to use her hands; Plaintiff was given a neurology referral. (AR 379, 380.) Plaintiff reported that any type of work caused pain, which triggered depression. (AR 379.) Review of the MRI showed no abnormalities other than the 1999 cervical fusion. (AR 378, 406.) On May 7, 2004, Plaintiff had a CT scan of her brain due to migraines and dizzy spells, and it was unremarkable with no abnormalities. (AR 402.) On August 10, 2004, Hanks reported that Plaintiff had been diagnosed with Reflex Sympathetic Dystrophy (RSD) by a neurologist, and she was referred to a specialist, Dr. Harvey Goodman. (AR 376-77.)

On October 20, 2004, Cotton recorded that Plaintiff suffered from chronic pain due to RSD, which caused acute right arm pain, limited range of motion in her right arm, and decreased right grip strength. (AR 266-67.) Plaintiff was referred for acupuncture and a physical therapy consult. (AR 267.) In December 2004, Plaintiff was diagnosed with bilateral heel spurs and referred to a podiatrist. (AR 264-65, 270-71.) On December 30, 2004, Plaintiff reported leg swelling, which was determined to be benign and she was told to improve hydration and elevate her legs daily. (AR 262-63.) On February 3, 2005, Dr. Darin Bocian, a podiatrist, prescribed functional orthotic devices and a specific walking shoe,

for bilateral plantar fasciitis with a heel spur, and right posterior tibial tenosynovitis.[2] (AR 317.)

From January to May 2005, Plaintiff was seen at Healthsouth Canada Crossroads Clinic for physical therapy with Lisa Ford. (AR 273-313.) At the January 5, 2005 initial assessment, Plaintiff had arm and hand pain and swelling, feet problems, neck pain and swelling, and pain in the shoulders. (AR 283.) Plaintiff was diagnosed with a complex myofascial pain syndrome causing significant tightness in the neck, chest and upper back, a rounded shoulder posture, and decreased range of shoulder motion. (AR 282, 278.) Plaintiff was prescribed manual therapy, aquatic exercise and a home exercise program. (*Id.*) Ford recorded that Plaintiff's physical problems might be, in part, a result of emotional trauma in the work place; she recommended intensive myofascial treatment or psychological treatment. (AR 281.) On March 22, 2005, Ford noted that Plaintiff's range of motion had increased and her neck muscles had loosened, Plaintiff reported feeling stronger, sleeping better, and having a decrease in sharp hand pain; however, Plaintiff remained quite limited as to what she could do. (AR 275, 276.) On April 21, 2005, Ford reported that Plaintiff had some relief from therapy but that she needed more intensive myofascial work than she could get at that clinic. (AR 274.) Plaintiff's May 20, 2005 discharge assessment reported that Plaintiff continued to have right hand/wrist, shoulder and neck pain daily (the level varied from day to day), and her right grip strength had decreased, however, she had returned to sheering sheep (but that did increase her pain). (AR 284.)

On January 7, 2005, Plaintiff first saw Dr. Jeffrey Loomer, a rheumatologist. Plaintiff reported poor sleep, generalized body pain, easy fatigability, poor memory and concentration, headaches, depression, and nausea. (AR 352, 353.) Plaintiff stated that Effexor had been helpful for the depression but she stopped taking it because she did not like being on medication. (AR 352.) Dr. Loomer found diffuse muscle tenderness, and possible arthritis

---

[2] In a March 2005 function report, Plaintiff stated that she never filled this prescription because her insurance would not provide coverage for it. (AR 174.)

in her third finger and right foot. (AR 353.) He concluded Plaintiff's symptoms were not consistent with RSD but were consistent with fibromyalgia, and he thought there might be some somatization. (AR 353.) Dr. Loomer saw Plaintiff on March 10, 2005, at which time he increased Plaintiff's Neurontin frequency and prescribed Mobic. (AR 607.) On April 21, 2005, Dr. Loomer stated that he would no longer be seeing Plaintiff because he would not be accepting her insurance. (AR 604.) Dr. Loomer wrote a letter to Nurse Cotton, in which he stated that his April examination of Plaintiff revealed diffuse muscle tenderness and left ankle tendon tenderness. (*Id.*) A recent bone density scan revealed normal values. (*Id.*) Dr. Loomer recommended she be followed by another rheumatologist. (*Id.*)

On April 27, 2005, Nurse Cotton at the Marana Health Center noted Plaintiff had been diagnosed with fibromyalgia, RSD had been ruled out, and Plaintiff's pain was well controlled with Neurontin. (AR 260-61.) Plaintiff was also being treated for depression and was on Lexapro, but was not noticing any improvement. (*Id.*) On April 29, Plaintiff was taken off Lexapro and prescribed Effexor, which she reported was improving her depression and giving her more energy. (AR 259.) As of May 4, 2005, Cotton recorded that Plaintiff had good pain control related to the fibromyalgia. (AR 258.) On August 31, 2005, Plaintiff reported bilateral hand pain, with the right being severe; a prescription for Mobic was helpful in decreasing severity but was not covered by insurance. (AR 251.) Plaintiff's handicap plate was renewed because walking more than 100 yards caused her debilitating pain. (*Id.*)

On April 6, 2005, V. J. Kattapong, a state agency physician, completed a physical residual functional capacity assessment based on a review of Plaintiff's records. (AR 341-48, 529.) Dr. Kattapong opined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, push/pull an unlimited amount, and stand/walk and sit 6 hours each of an 8-hour day. (AR 342.) The doctor found Plaintiff only partially credible because x-rays did not reveal any basis for the hand/wrist pain she reported; he stated she engages in somatization. (*Id.*) Dr. Kattapong further concluded that, if Plaintiff followed the medical recommendations, by January 2006, she could have minimal limitations. (AR 343-45.)

On July 13, 2006, Plaintiff returned to Dr. Loomer. (AR 647.) Plaintiff was achy and tender to the touch, she reported an occasional headache, and poor memory and concentration. (*Id.*) On January 15, 2007, Dr. Loomer completed a form titled "Medical Work Tolerance Recommendations," relevant to the period beginning in January 2005, through the date of the form. (AR 621-22.) Dr. Loomer opined that Plaintiff could do four hours a day of sedentary work and fifteen minutes of light work, working three days per week. (AR 621, 622.) During a workday, Plaintiff could stand for fifteen to thirty minutes at a time, sit for one hour at a time (for at total of 2 hours), and walk for thirty minutes at a time (for a total of four hours), with frequent changes in position. (AR 621.) Plaintiff could drive or ride in a car for an hour at a time, driving for a total of four hours or riding for a total of five hours. (*Id.*) Dr. Loomer found that Plaintiff would miss 12-15 workdays per month due to disability. (*Id.*) Plaintiff could occasionally bend, crouch, kneel, squat, reach above shoulder level, power grip, push/pull, pinch, and do fine movements, but should avoid sitting in a clerical position and working with arms extended in front of her. (AR 622.) Additionally, Plaintiff should avoid extreme heat/cold, sudden temperature/humidity changes, exhaust fumes, dust, smoke, strong odors, unprotected heights, and moving machinery. (*Id.*)

Mental History

On November 24, 2004, Plaintiff was evaluated by psychologist Nancy Eldredge, for purposes of vocational rehabilitation services. (AR 626-39.) At that time, Plaintiff was working twenty to twenty-four hours per week and was considering pursuing a master's degree. (AR 626-27.) Plaintiff reported to Dr. Eldredge that she was not depressed, but she had a history of depressive episodes. (AR 629.) Plaintiff's test results revealed a high average IQ, and all other tests were average to superior; the exception was a low average score on alertness to essential visual details. (AR 631-32.) Plaintiff's general memory ability was in the high average range, and "[o]verall, her memory [wa]s intact." (AR 633, 637.) Plaintiff's visual memory was relatively weak, low average but rising after a delay, which suggested difficulty with quick processing but improvement with more time. (AR

634, 637.) Plaintiff performed in the above average range for tasks requiring sustained attention and visual tracking and for tasks requiring symbolic sequencing and rapid attention shifts between dissimilar sets. (AR 634.) Plaintiff was not found to have problems with attention or vigilance. (AR 634-35.) Plaintiff's perceptual functioning was intact, her executive problem-solving skills were above-average, and her academic levels were at or above her education level. (AR 635-36.) Dr. Eldredge noted Plaintiff had reported attentional problems impacting her daily functioning and concluded that emotional factors, preoccupation, worry, and her health could affect Plaintiff's ability to concentrate. (AR 635, 638.)

Dr. Eldredge found that Plaintiff had mild emotional distress and was endorsing "multiple vague somatic complaints," which may be used to manipulate and control. (AR 636-37.) Additionally, she opined that Plaintiff "may be resistant to psychological interpretations and treatment, preferring physical explanations for pain." (AR 638.) On self-report, Plaintiff endorsed symptoms of PTSD that she believes to be interfering with her daily functioning. (AR 637.) Dr. Eldredge concluded Plaintiff met the criteria for PTSD and recurrent major depression, despite Plaintiff indicating those symptoms were not currently prominent. (AR 638.) Dr. Eldredge found that Plaintiff might not have the ability to work full time in light of doctor's opinions and the connection between emotional functioning and pain. She suggested that counseling and Effexor, which had been prescribed but Plaintiff currently was not taking, might be helpful. (AR 638, 639.)

On April 20, 2005, psychologist Thomas McCabe conducted an examination of Plaintiff at the request of the Social Security Administration (SSA). Dr. McCabe concluded Plaintiff did not have a major mental disorder or a personality disorder, and that any limitations were from physical disorders. (AR 340.) Plaintiff reported having been diagnosed several years prior with PTSD by a SSA doctor, related to a work incident. (AR 338.) Plaintiff had a high average IQ, all of her testing was in the normal to high average range, there was no indication of memory impairment, and she was found capable of

understanding and following directions; however, she did appear tired toward the end of testing. (AR 339-40.)

On May 6, 2005, psychologist Paul Tangeman completed a Psychiatric Review Technique (PRT) form and found that Plaintiff had no medically determinable impairments based on a review of her records. (AR 318-31.) Dr. Tangeman noted that Plaintiff alleged PTSD but cited April 2005 testing to discount the assertion. (AR 330.) On February 22, 2006, psychologist Alan Goldberg completed a PRT form based on a review of Plaintiff's records, and found no medically determinable impairments; he did not assess any functional limitations. (AR 235-48.)

On February 15, 2007, Plaintiff was evaluated by psychologist Glenn Marks at the request of her attorney. (AR 649-72.) Dr. Marks noted that Plaintiff reported her inability to work was primarily due to medical issues rather than emotional ones. (AR 650.) Plaintiff reported an increase in feelings of depression in the prior six to eight months, as well as concentration and memory problems. (AR 652.) Dr. Marks found no evidence of malingering or misrepresentation of symptoms. (AR 653.) Dr. Marks diagnosed Plaintiff with: ADHD (by history), PTSD–chronic, psychological factors affecting medical condition, depression NOS, and histrionic personality traits. (AR 654.) Based on the MMPI-2, Dr. Marks found that Plaintiff may be "converting psychological problems into physical symptoms," rather than addressing the psychological problems. (AR 653.) Dr. Marks found Plaintiff's various medical and psychological symptoms were interrelated and that it was difficult to distinguish between the two. (AR 654.) Dr. Marks concluded that Plaintiff's chronic psychological conditions did not, alone, preclude Plaintiff from working; however, in combination with her physical limitations he thought it was doubtful she could maintain stable employment. (AR 655.)

Dr. Marks found Plaintiff mildly limited in her ability to understand, remember and follow detailed instructions, sustain an ordinary routine without special supervision, accept instruction and criticism, get along with coworkers, and respond to changes in the work setting; and moderately limited in her ability to maintain prolonged concentration, timely

perform on a regular schedule, and complete a day or week without psychological interruptions. (AR 656-58.) He further found that she had a mild limitation in activities of daily living; moderate limitations in social functioning and maintaining concentration, persistence and pace; and one or two episodes of decompensation. (AR 669.)

Lay Witness Evidence

Larry Whitmer wrote an undated letter to ALJ Dostal stating that in the five years following August 2001 (when he first met Plaintiff), Plaintiff's hands and feet swelled, causing her pain, and her energy markedly decreased. (AR 232.)

On February 11, 2007, Plaintiff's daughter, Bonnie Rae LaVoie, submitted a letter. (AR 233.) LaVoie stated that Plaintiff's conditioned had worsened and she could no longer volunteer/work for even short periods due to pain. (*Id.*) In particular, Plaintiff's hands were in constant pain and had no strength, and standing for even a short time caused foot pain. (*Id.*) LaVoie reported that Plaintiff's eyes would go out of focus and cause migraines and she suffered from back pain when sitting, standing and even laying down. (*Id.*) LaVoie emphasized that previously Plaintiff had been extremely physically active with many interests and that she hardly was able to do anything due to constant pain. (AR 233-34.)

Plaintiff's son, Dustin Gunn, testified at the January 2007 hearing that his mother's condition had gotten progressively worse and that she was always in pain and had less energy. (AR 82.) He stated that when she did even small things or walked too much, she would be incapacitated for the next day or more, and that she struggled with depression and her memory. (AR 82-83.)

On October 24, 2007, Plaintiff's most recent supervisor Alexis Grae with Turning Point of Central California in Marana, Arizona submitted a letter. (AR 724.) She stated that Plaintiff worked for them for a year and over time cut her hours from 35 down to 6, and then finally quit because she could not physically do the job. (AR 724.) Grae stated that Plaintiff was a valuable employee but she had many limitations including being unable to carry her paperwork, keep her paperwork up to date, walk the distance to the classrooms, or hold even

light things without dropping them. (*Id.*) Grae stated that it was apparent as time went on that Plaintiff was physically deteriorating and did not have the energy to do the job. (*Id.*)

Plaintiff's Testimony

On March 14, 2005, Plaintiff completed a function report in which she stated she lived with her son, for whom she shopped and transported him to doctor appointments for social anxiety. (AR 168-69.) At that time, she was attending two doctor and physical therapy appointments a week, pool therapy twice a week, and once a month meetings with a vocational rehabilitation counselor. (AR 168.) She reported interrupted sleep of five to six hours a night. (AR 168, 169.) Plaintiff stated that personal care was difficult because pulling, reaching, and holding small items were all painful. (AR 169.) Plaintiff stated she mostly ate instant or frozen food because cooking was exhausting and slow. (AR 170.) She did light cleaning but significant cleaning caused lasting pain. (*Id.*) Plaintiff indicated driving was painful so she only did it when necessary or to see her daughter, and she shopped approximately twice a month, which took several hours. (AR 171.) Plaintiff indicated she played games, listened to books on tape, and watched movies. (AR 172.) About once or twice a week she would see friends or family. (*Id.*) Plaintiff reported that walking and standing was painful, as were many physical movements (lifting, bending, squatting, reaching, stair climbing). (AR 173, 175.) She indicated that stress would cause all-over pain and sometimes brought on migraines. (AR 174.)

In a November 27, 2005 function report, Plaintiff reiterated or expanded upon much of the same information in the March report. (AR 145-52.) Plaintiff stated that significant activities such as shopping or laundry took her all day to complete, she could not do yard work, and throughout the day she did small activities separated by rest and maybe a nap. (AR 145, 148.) Plaintiff continued to drive, going out three to four times a week. (AR 148.) Plaintiff indicated she used to be a very active, athletic person with many interests but now she spent her time watching television, listening to tapes, writing, playing computer games, going to the movies, spinning yarn and doing photography. (AR 149, 150, 152.) Plaintiff stated that she would see her daughter and granddaughter two or three times per month, her

friends once or twice a month, and would visit her boyfriend in New Mexico two to three times per month. (AR 149.) Plaintiff marked that all physical activities caused her pain, she could only walk approximately 200 yards very slowly, she was easily distracted and struggled with verbal instructions but did well with written instructions. (AR 150.) She had a wrist and ankle brace, had to switch to an automatic transmission car, and used a wheelchair if she was in a location that would require a lot of walking. (AR 151.)

At the January 2007 hearing, Plaintiff testified that she currently was taking Neurontin, for chronic nerve denervation, meloxicam (the generic of Mobic), for her hands and feet, and a muscle relaxant. (AR 65-66.) Plaintiff stated she was in constant pain, worst in her back, but also in her shoulders, arms, hands and feet. (AR 66.) She described being able to stand or sit in one position for about fifteen minutes, and she could walk for shopping approximately thirty minutes (but that would cause significant pain). (AR 67.) She continued driving, did light housekeeping, would spin yarn, watched television and movies, and would go to the movies with her son twice a month. (AR 69-70.) Plaintiff testified that she stopped working because she was in so much pain she could barely walk, she couldn't sleep, clean, cook or anything. (AR 71-72.) She reported napping for approximately fifteen minutes each day because she had problems sleeping. (AR 74-75.) Plaintiff stated that her hands don't straighten completely or close completely, that she gets spasms and drops things frequently. (AR 75.) Due to her foot problems, she stated that walking was very painful. (AR 76.) She testified that she has only enough energy to putter around for four hours a day, that she gets migraines when stressed and her depression varies from day to day. (AR 77.) She testified she could not do her prior work at the prison, or in a group home, because she lacked the alertness necessary for security, that she easily could be overcome physically because of her condition, and that she could not keep up with the paperwork due to her memory and inability to write or spend long periods of time on the computer. (AR 78, 79.) Plaintiff submitted a post-hearing letter to the ALJ, in which she summarized the impact fibromyalgia had on her life.

Vocational Evidence

Vocational expert Stacia Schonbrun testified at the hearing that Plaintiff's prior work as a substance abuse counselor was sedentary and skilled. (AR 85.) Work as a corrections officer and as a behavior management specialist in a group home was medium semi-skilled work. (AR 86.)

The ALJ provided a hypothetical of a person with limitations of lifting ten pounds frequently, 20 pounds occasionally, occasionally balancing, crouching, stooping, crawling, bending, kneeling and climbing, and problems grasping with her fingers. (AR 88.) Additionally, the person has slight pain in her head, neck, back, shoulders, arms, hand, feet and stomach (from irritable bowel syndrome), fibromyalgia, some fatigue, and is obese. (*Id.*) All of her conditions would have a slight affect on the person and could be controlled with medication. (AR 88-89.) Further, the person has psychiatric problems of a slight nature, including depression, anxiety with PTSD syndrome, and decreased concentration and memory. (AR 89.) Based on that hypothetical, Schonbrun concluded Plaintiff could work as a substance abuse counselor, as a pizza deliverer and as a substitute teacher. (*Id.*) In the second hypothetical the person's pain and psychiatric problems would be of a moderate nature with a moderate affect on her abilities, but controlled by medication. (AR 90.) Schonbrun testified such a person could do the same jobs as in hypothetical one. (*Id.*) The third scenario the ALJ presented was if the person's pain and psychiatric problems were severe and not controllable with medication, in which case, Schonbrun stated that the person could not do Plaintiff's past relevant work or any other work. (AR 91.) Schonbrun then testified that a person with the limitations identified by Dr. Loomer in the January 15, 2007 form could not do Plaintiff's past relevant work or any other work. (AR 92.)

Schonbrun opined that if Plaintiff's testimony at the hearing that day was fully credited that she could not return to any of her past work. (AR 93.) Also, because Plaintiff did her counseling work in a prison where she was required to restrain inmates, it was a medium level of work. (AR 94-95.)

<u>The ALJ's Ruling</u>

The ALJ found that Plaintiff had the following severe impairments at step two: myofascial pain syndrome, obesity, status post cervical fusion, plantar fasciitis, fibromyalgia, major depression, anxiety disorder, and PTSD. (AR 29.) The ALJ found that Plaintiff's allegations regarding the severity and functional consequences of her symptoms were not entirely credible. (AR 33.) The ALJ concluded Plaintiff had the RFC to do light work (AR 33), and that she could do her past relevant work as a substance abuse counselor (AR 35). Thus, the ALJ found Plaintiff not disabled at step four. (*Id.*)

Plaintiff submitted to the Appeals Council post-hearing evidence from Drs. Marks and Loomer (AR 718-22), which the Court considers to the extent relevant to topics raised by Plaintiff.

## STANDARD OF REVIEW

The Commissioner employs a five-step sequential process to evaluate DIB and SSI claims. 20 C.F.R. §§ 404.1520, 416.920; *see also Heckler v. Campbell,* 461 U.S. 458, 460-462 (1983). To establish disability the claimant bears the burden of showing he (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) claimant's residual functional capacity (RFC) precludes him from performing his past work. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

In this case, Plaintiff was denied at step four of the evaluation process. Step four requires a determination of whether the claimant has sufficient RFC to perform past work. 20 C.F.R. § 404.1520(e). Residual functional capacity is defined as that which an individual can still do despite his limitations. 20 C.F.R. § 404.1545. If the ALJ concludes the claimant has RFC to perform past work, the claim is denied. 20 C.F.R. § 404.1520(f). An RFC

finding is based on the record as a whole, including all physical and mental limitations, whether severe or not, and all symptoms.  Social Security Ruling (SSR) 96-8p.

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)).  The findings of the Commissioner are meant to be conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "more than a mere scintilla but less than a preponderance." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)).  The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001).  This is so because the ALJ "and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney,* 981 F.2d at 1019 (quoting *Richardson v. Perales*, 402 U.S. 389, 400 (1971)); *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1198 (9th Cir. 2004).  The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (citing *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)).  Reviewing courts must consider the evidence that supports as well as detracts from the Commissioner's conclusion.  *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975).

**<u>ANALYSIS</u>**

<u>Inconsistencies in the ALJ's Findings</u>

Plaintiff argues it was inconsistent for the ALJ to find that Plaintiff had severe mental impairments at step two but no mental limitations with respect to her RFC.  At step two, the ALJ found that Plaintiff had numerous severe impairments, including major depression, anxiety disorder and PTSD.  (AR 29.)  When assessing Plaintiff's RFC, the ALJ found that Plaintiff's psychological impairments caused "moderate difficulty with concentrating, focusing, and memory that are or can be controlled with medications without significant side

- 14 -

effects." (AR 30, 34.)  The ALJ noted that Plaintiff "took psychotropic medications prescribed by her primary care physician" (AR 31), that she had taken a variety of medications (AR 34) and that taking Effexor had been helpful but she discontinued taking it (AR 32).  Plaintiff contends the ALJ's conclusion amounted to a finding that she had no mental impairment as to her RFC, despite finding a moderate impairment.

At step two, a finding of severity is based on all impairments considered in combination, 20 C.F.R. § 404.1523; therefore, no single impairment must be severe to qualify under step two.  Further, the finding of a severe impairment(s) at step two is a *de minimis* standard and an impairment(s) can be found not severe "*only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Webb v. Barnhart*, 433 F.3d 683, 686-87 (9th Cir. 2005) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996)).  Plaintiff is correct that the ALJ concluded, based on evidence in the record, that Plaintiff's mental impairments did not cause significant functional limitations because they were controllable with medication.  There is nothing inconsistent in the ALJ's finding that Plaintiff's impairments all taken together are severe at step two, but that her mental impairments cause no functional limitation because they are controllable with medication.

Next, Plaintiff contends the ALJ's finding that she had "moderate pain" and "symptoms from fibromyalgia" was inconsistent with his finding that the symptoms could be controlled with medication.  (AR 30.)  Plaintiff fails to acknowledge that the ALJ found she had physical limitations, including lifting twenty pounds occasionally and ten pounds frequently, and only occasionally bending, climbing, balancing, stooping, kneeling, crouching and crawling (AR 30); overall, he concluded Plaintiff could do only "light work" (AR 33).  The ALJ noted that Plaintiff indicated Neurontin "controlled her pain and was well-tolerated" and a medication change in 2006 improved Plaintiff's energy, sleep, and fibromyalgia symptoms.  (AR 31.)  There is nothing contradictory in the ALJ's finding that Plaintiff's fibromyalgia, in combination with her other impairments, was severe at step two and imposes only the level of  functional limitations set forth above.

<u>Fibromyalgia</u>

Plaintiff argues the ALJ unreasonably assessed her fibromyalgia by relying on the absence of weight loss and muscle atrophy/muscle wasting as relevant to her limitations, discounting the severity of the condition based on the absence of physical therapy, and finding that it was controlled or could be controlled by medication.

The findings that Plaintiff critiques were part of the ALJ's credibility assessment – he concluded that Plaintiff's "statements concerning the intensity, duration and limiting effects of [her] symptoms are not entirely credible." (AR 31.) The ALJ cited several bases for this finding with respect to Plaintiff's physical symptoms. First, the ALJ stated that the severity of Plaintiff's pain was disproportionate to the clinical and laboratory findings. Specifically: an MRI showed no significant stenosis or disc protrusion; foot x-rays revealed heel spurs that were tiny to small; her initial rheumatologist evaluation revealed diffuse muscle tenderness, mild swelling at third PIP joint, and nodular swelling in right medial mid-foot area, but nothing else remarkable; Neurontin was controlling the pain and an additional medication was helping the achilles tendonitis, although it remained symptomatic; in late 2004 to early 2005, a fall caused back pain but no weakness or numbness; in the summer of 2006, a medication change improved Plaintiff's sleep, energy and fibromyalgia symptoms; and Plaintiff remained symptomatic with fatigue and global muscle tenderness despite improvement. (AR 31.)

Second, the ALJ cited inconsistencies in the record that called Plaintiff's credibility into question. She reported and testified to memory problems but testing revealed a memory in the high average range; her 2007 psychological evaluation did not address any memory issues; and she was considering pursuing a master's degree, which seemed at odds with reported memory difficulties. (AR 32.) Her reporting of childhood abuse during psychological evaluations was inconsistent. (*Id.*) Further, she told Dr. Loomer that taking Effexor had been helpful but she stopped using it because she did not want to be on medication; in a prior evaluation, she reported not taking it for financial reasons. (*Id.*)

Third, the ALJ noted that Plaintiff had significant gaps in medical care and likely

would have sought more specialized treatment if the symptoms were as severe as alleged. (AR 32.) For example, her primary care records only go through August 2005, she had a gap in visits to her rheumatologist between April 2005 and July 2006, she had no ongoing mental health treatment, and she received physical therapy only in early 2005 although the records indicated it allowed her to increase her physical activity level. (*Id.*) Fourth, the ALJ stated that common side effects of chronic pain were weight loss and diffuse atrophy/muscle wasting. (*Id.*) The record did not reveal either of these effects, and the ALJ, therefore, inferred that the pain had not altered her muscle use to the level of atrophy/muscle wasting. (*Id.*) Fifth, the ALJ found that Plaintiff's activities of daily living, including her hobbies, social interactions, household tasks and travel, indicated a significant level of functioning. (AR 33.)

Overall, the ALJ's credibility finding is supported by substantial evidence and is not challenged by Plaintiff. However, the Court addresses the three specific issues raised by Plaintiff. To the extent the ALJ relied on the absence of weight loss and muscle atrophy/wasting, that was relevant only to Plaintiff's credibility regarding her pain, not fibromyalgia generally. Further, even if this statement was erroneous, as suggested by Dr. Marks and Dr. Loomer (AR 719, 722), or not independently supported by evidence in the record, it is harmless because there is substantial other record evidence to support the ALJ's credibility finding regarding Plaintiff's pain. *See Stout v. Comm'r, Social Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (an error is harmless if it was "irrelevant to the ALJ's ultimate disability conclusion.") Next, although Dr. Loomer's post-hearing submission indicates that physical therapy was not likely to assist Plaintiff's pain (AR 722), the records before the ALJ indicated that physical therapy had some positive impact on her range of motion and tightness (AR 284). Regardless, this was only one example of several indicating that Plaintiff's level of treatment did not match her alleged symptoms; the rest of the points

1   relied on by the ALJ remain valid and are supported by substantial evidence in the record.[3]

2   Additionally, the physical therapist recommended intensive myofascial treatment, including

3   a seminar during the upcoming summer, or psychological treatment, neither of which

4   Plaintiff pursued. (AR 281, 284.)

5          Finally, Plaintiff disputes the ALJ's finding that Plaintiff's fibromyalgia was

6   controlled by medication. She argues the evidence proves she could not work full-time

7   despite the use of medications; however, she fails to articulate or explain the relevance of any

8   particular evidence. Plaintiff cites generally to Dr. Loomer's records from 2005 through

9   2007, his January 15, 2007 Medical Work Tolerance Recommendations form, and his May

10  23, 2007 post-hearing submission.[4]

11         As an initial matter, Dr. Loomer's statements regarding medication and fibromyalgia

12  in his May 2007 letter are generic and provide no support for Plaintiff's argument:

13                 It is certainly fair to make the statement from a rheumatologist's standpoint
                   that at this point in time, there are no specific cure-all medications for
14                 fibromyalgia. As you know, there are no medications that have been
                   specifically designed to treat fibromyalgia. However, medications that have
15                 been used to manage this condition have included several of the antidepressant
                   medications which come under the family of SSRIs, tricyclics, and
16                 heterocyclic medications. As a rheumatologist, we also have used muscle
                   relaxants, antianxiety medications, nonsteroidals, and for some patients opioids
17                 are necessary. The management of fibromyalgia is clearly an art – it takes
                   years of experience managing these patients and their medication regimen is
18                 certainly specifically customized. It should also be noted that there are some
                   patients that unfortunately cannot be helped with medication.
19
    (AR 721.)
20

21  _____

22       [3]    Dr. Loomer clarified in his post-hearing submission that the gap in his treatment of
    Plaintiff was due to a period of time in which he did not accept her insurance. (AR 721.)
23  However, in April 2005, Dr. Loomer informed Plaintiff and her primary care doctor of the
    importance of finding another rheumatologist. (AR 604.) No records indicate she followed
24  that recommendation.

25       [4]    Plaintiff also cites to a January 15, 2007 letter from Dr. Loomer to Plaintiff's counsel
26  in response to an inquiry. In that letter, he reported only that Plaintiff had told him she had
    suffered from depression since age 12 and had seen several psychiatrists, but that he was in
27  no position to make a diagnosis regarding depression. (AR 624.) This letter has no relation
    to Plaintiff's fibromyalgia or the medication used to treat it.
28

A review of Dr. Loomer's treating records, to the extent legible, reveals that Dr. Loomer regularly adjusted or changed the medication he prescribed for Plaintiff and she remained symptomatic, although her symptoms were variable. (AR 352, 53, 604-10, 640-48.) However, the records from Dr. Loomer's office and the Marana Health Center also recount that Plaintiff tolerated some of the medications well and they were helpful in controlling her pain and improving her sleep. (AR 251, 258, 261, 352-53, 604-08, 609-10, 641-44, 646, 648.) Finally, on the January 15 form and in his May 2007 letter, Dr. Loomer opined that Plaintiff could not maintain full-time gainful employment. (AR 621-22, 722-23.)

To the extent Plaintiff is contesting the ALJ's treatment of Dr. Loomer's ultimate opinion that Plaintiff could not work, it is fully addressed in the section below. With respect to the narrower issue of medication, the ALJ cited record evidence indicating that medication improved Plaintiff's symptoms. More importantly, this finding by the ALJ was part of an extensive analysis in which the ALJ concluded Plaintiff's symptoms were not as debilitating as she alleged based on the objective medical evidence, the level of treatment she pursued, and her activities of daily living. (AR 30-34.) Because the ALJ found that Plaintiff's symptoms were less severe than alleged and there was record evidence that medication improved Plaintiff's symptoms, the ALJ's conclusion was supported by substantial evidence.

In sum, there was substantial evidence in the record to support the ALJ's credibility findings regarding Plaintiff's allegations of pain.

Muscle Atrophy

Plaintiff argues the ALJ made an improper medical finding, not supported by substantial evidence, when he based his RFC and credibility findings on the absence of diffuse atrophy or muscle wasting. The ALJ's finding to which Plaintiff objects was part of his assessment of Plaintiff's RFC and credibility:

> Two common side effects of prolonged and/or chronic pain are weight loss and diffuse atrophy or muscle wasting. There [sic] record shows that the claimant's weight has remained relatively stable since her alleged onset date. There is also no record in any of the clinic notes regarding diffuse atrophy or muscle wasting. It can also be inferred that, although she undoubtedly experiences some degree of pain, that pain has apparently not altered her use

of her muscles and joints to the extent that it has resulted in diffuse atrophy or muscle wasting.

(AR 32.)

As discussed extensively in the above section, the ALJ set forth numerous bases for his finding that Plaintiff's allegations regarding pain were not entirely credible. Even if this specific finding regarding muscle atrophy/wasting was not supported by record evidence, overall, the ALJ's credibility finding was supported by substantial evidence; therefore, any error was at most harmless. *See Stout*, 454 F.3d at 1055 (an error is harmless if it was "irrelevant to the ALJ's ultimate disability conclusion.").

Lay Witness Statements

Plaintiff argues the ALJ erroneously rejected Plaintiff's daughter's and son's statements. The ALJ stated that he gave little weight to Plaintiff's daughter's written statement "given the close relationship with the claimant and the likelihood that the daughter was possibly influenced by her desire to help the claimant." (AR 34.) Similarly, the ALJ stated, "[a]lthough the claimant's son appeared to be a sincere witness, the undersigned gives little weight to his statement and finds the objective evidence more convincing." (*Id.*)

ALJs must consider lay witness testimony and rejection of lay testimony requires reasons specific to each witness. *Stout*, 454 F.3d at 1053. Such error can only be considered harmless if the Court "confidently conclude[s] that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Id.* at 1056.

The parties cite conflicting Ninth Circuit law on what grounds an ALJ can use to reject lay witness testimony. There are cases which suggest the family relationship is not a basis for rejecting lay witness testimony, *see Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996) (precluding the rejection and "wholesale dismissal" of lay testimony because it is given by a family member), while others find that to be an appropriate reason, *see Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (finding ALJ's consideration of the witness's close relationship with the claimant and her desire to help, germane reasons for discounting lay testimony). Similarly, there are cases which state that the lack of medical evidence

supporting a lay statement is not a proper reason to discount it, *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) (finding it improper to reject lay testimony on subjective symptoms because it is not supported by medical evidence) (citing *Smolen*, 80 F.3d at 1289), and other cases that say it is, *see Greger*, 464 F.3d at 972 (finding inconsistency with medical records relevant to the assessment of lay testimony; *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (upholding ALJ discrediting portions of lay testimony because it was inconsistent with medical evidence).

The Court finds most important to this analysis the fact that the ALJ did not ignore or wholesale reject the testimony of Plaintiff's daughter and son. Rather, the ALJ considered the testimony and credited it, but found it not weighty for specific reasons that the Ninth Circuit has upheld. Therefore, the Court finds the ALJ did not err in his assessment of the lay witness testimony.

Dr. Loomer's Opinion

Plaintiff argues the ALJ failed to provide sufficient reasons to reject Dr. Loomer's opinion that Plaintiff could not work on a full-time basis, even in a sedentary job. The ALJ made the following statement regarding Dr. Loomer's opinion:

> Dr. Loomer, opined that the claimant is able to perform sedentary work for three to four hours daily, indicating that she could sit for a total of two hours and walk no more than four hours. Additionally, she could drive a car four hours and ride in a car a total of five hours which is a [sic] longer than the two-hour period he imposed for her sitting limitations (Exhibit 15F). Due to the inconsistencies on the face of the opinion provided by Dr. Loomer, this opinion is not being given controlling weight despite being from a treating physician.

(AR 33.) He later opined, "the assessment by the treating physician is overly restrictive and is given little weight as fully explained above." (AR 35.)

If a treating doctor's opinion is not contradicted, the ALJ must provide "clear and convincing" reasons to reject it. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (quoting *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991)). If a treating doctor's opinion is contradicted by another physician, the ALJ may reject it, if he provides "'specific and legitimate reasons' supported by substantial evidence." *Id.* (quoting *Murray v. Heckler*, 722

- 21 -

F.2d 499, 502 (9th Cir. 1983)).

The governing regulations provide significant guidance regarding the factors the ALJ should consider when evaluating medical opinions. Specifically, if a treating physician's opinion is well-supported and not inconsistent with substantial evidence in the record, then the ALJ should give it controlling weight. 20 C.F.R. § 404.1527(d)(2). If the treating doctor's opinion is not given controlling weight then, in assessing the weight it will be given, the ALJ considers the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician, and the "nature and extent of the treatment relationship" between the patient and the treating physician. 20 C.F.R. § 404.1527(d)(2)(i)-(ii). Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs" and their evidentiary requirements', and the degree of his or her familiarity with other information in the record. 20 C.F.R. § 404.1527(d)(3)-(6).

The ALJ provided a sufficient reason for not giving Dr. Loomer's opinion controlling weight, because it is on it's face contradictory. Plaintiff did not dispute the ALJ's rejection of Dr. Loomer's opinion as controlling. Rather, Plaintiff contends only that the ALJ did not provide sufficient reasons for discounting Dr. Loomer's opinion that Plaintiff could not work on a full-time basis, even in a sedentary capacity. In reaching a conclusion contrary to Dr. Loomer, the ALJ relied on Dr. Kattapong's opinion, the objective medical evidence, Plaintiff's lack of consistent medical care for her impairments (including a significant gap in seeing Dr. Loomer or another rheumatologist), her daily activities, and his finding that she was not entirely credible as to the intensity of her symptoms. (AR 30-34.) There is

substantial evidence in the record to support this portion of the ALJ's decision.[5]

Dr. Marks's Opinion

Plaintiff argues the ALJ failed to provide sufficient reasons to reject Dr. Marks's opinion regarding Plaintiff's functional limitations, which she argues would prevent her from working as a substance abuse counselor. The ALJ made the following findings regarding Dr. Marks's opinion:

> Turning to her psychological limitations, the State agency physicians concluded that the claimant did not have a medically determinable psychiatric impairment based upon the assessment and opinion of the examining psychologist, Thomas McCabe, Ph.D. (Exhibits 1F/84, 1F/1, & 1F/98-196). Recently, another examining psychologist, Glenn Marks, Ph.D., opined that the claimant had mild to moderate limitations (Exhibits 20F & 21F). He indicated that there is extensive documentation of her medication and treatment of mood disorders and discounted Dr. McCabe's conclusions (Exhibit 19F/3). However, his written report describes only intermittent counseling and a variety of medications, although the claimant was not taking any at the time of the evaluation (Exhibit 19F/4). Interestingly enough, although Dr. Marks gave a number of Axis I and II diagnoses, the only impairment indicated on his psychiatric review technique form was personality disorder (Exhibits 19F/6 & 21F). He noted that the claimant was only mildly limited in her ability to understand, remember, and carry out detailed instructions; interact in a socially appropriate manner; and adapt to work place changes. However, she was moderately limited in her ability to maintain concentration and persistent [sic] for extended periods, perform activities within a schedule, and complete a workday/workweek without interruptions from psychologically based symptoms (Exhibit 20F). In his written report, he commented that she was not precluded from gainful employment, noting that she had worked throughout most of her adult life, he concluded that it was doubtful that she would be able to maintain long-term employment without a high level of work accommodations (Exhibit 19F). While the undersigned has given this opinion greater weight than that of the State agency, it is not adopted completely due to the claimant's lack of ongoing mental health care. Furthermore, such an opinion is inconsistent with her varied activities of daily living. The undersigned finds that the claimant has mild to moderate mental limitations which are or could be controlled with medication.

(AR 34.)

The ALJ gave Dr. Marks's opinion weight, in fact greater weight than the State agency doctors. Further, the ALJ agreed that Plaintiff had mild to moderate limitations,

---

[5] Plaintiff's arguments as to Drs. Loomer and Marks are cursory (Dkt. 14-2 at 15-16) and she provided no substantive reply on these arguments (Dkt. 24 at 12).

including a moderate limitation in concentrating, focusing and memory.[6] To the extent the ALJ did not entirely adopt Dr. Marks's opinion about Plaintiff's ability to work, he provided specific and legitimate reasons for doing so. He noted that she had not received any consistent mental health care over the years and that her activities of daily living were inconsistent with the doctor's opinion; both of those statements are supported by substantial evidence in the record. Finally, the ALJ found that Plaintiff's psychological impairments and limitations were controllable with medication. Plaintiff has not disputed this finding nor cited any record evidence discounting it.

ALJ's Step-Four Analysis

Plaintiff argues that ALJ's step-four conclusion, that Plaintiff can perform her past relevant work, is not supported by substantial evidence.

To support a determination that the claimant has the capacity to perform her past relevant work, the ALJ must make three findings: "1. A finding of fact as to the individual's RFC. 2. A finding of fact as to the physical and mental demands of the past job/occupation. 3. A finding of fact that the individual's RFC would permit a return to his or her past job or occupation." SSR 82-62. The assessment at step two and three can be based on one of two findings, "1. The actual functional demands and job duties of a particular past relevant job; or 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy." SSR 82-61. Thus, a claimant is not disabled if she "can perform the functional demands and job duties as generally required by employers throughout the economy." SSR 82-61; *Villa v. Heckler*, 797 F.2d 794, 798 (9th Cir. 1986) (Plaintiff has the "burden of proving an inability to return to his former *type* of work and not just to his former job.").

---

[6]   Plaintiff's only specific argument is that she could not work as a substance abuse counselor based on Dr. Marks's finding that she had a moderate limitation in her ability to understand and remember detailed instructions; however, in that area, Dr. Marks found she was only mildly limited.  (AR 656.)

- 24 -

The ALJ assessed Plaintiff's RFC as required and concluded Plaintiff could perform light work (AR 30). 20 C.F.R. § 404.1567(b). Plaintiff is not challenging the ALJ's RFC finding as part of this argument. With respect to the second and third factors, the ALJ made the following findings:

**6.   The claimant is capable of performing past relevant work as a substance abuse counselor.   This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).**

The testimony of the vocational expert was that the claimant's past relevant job as a substance abuse counselor is sedentary and skilled.  In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually performed.

The undersigned finds that the hypothetical questions accurately describe and individual of the claimant's vocational background and functional limitations. The vocational expert testimony, consistent with the information in the Dictionary of Occupational Titles, was that she could perform her past relevant work as a substance abuse counselor.

(AR 35.)

The focus of Plaintiff's argument is that the ALJ erred in stating she could do her past work "as actually performed." (*Id.*) Plaintiff is correct that the vocational expert did not provide testimony about Plaintiff's past work *as actually performed*. Rather, the vocational expert stated that her testimony was based solely on Plaintiff's past work as "generally performed in the national economy," and she did not have information on the physical limitations of the actual jobs. (AR 94.) To the extent Plaintiff worked as a substance abuse counselor as a prison employee, the expert classified the job as corrections officer/addictions counselor. She explained that job, which involved restraining inmates, takes on the more physical Dictionary of Occupational Titles (DOT) classification of medium that is attached to being a corrections officer. (AR 94-95.) Plaintiff's RFC, as found by the ALJ, did not qualify her for this work. However, the substance abuse counselor job that Plaintiff performed as a civilian-contractor did not require restraint of inmates; as to that job, the expert testified it was skilled and sedentary as generally performed. (AR 85-86, 95.)

The Court must consider the entirety of the record in determining whether to affirm the Commissioner's decision. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). The ALJ ultimately concluded that Plaintiff could perform her past work as a substance abuse counselor (non-corrections), and that finding is not erroneous. An ALJ is not required to make findings about past work as actually performed <u>and</u> generally performed; rather, the vocational expert need only conclude that a claimant can do his past work as defined in the regulations. *See Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001). The ALJ's singular reference to past work "as actually performed" appears to be a misstatement and is, at most, harmless error. *See Stout*, 454 F.3d 1050, 1055 (9th Cir. 2006) (an error is harmless if it was "irrelevant to the ALJ's ultimate disability conclusion."). There is substantial record evidence to support the conclusion that Plaintiff could perform her past relevant work as generally performed in the national economy and it is this evidence upon which the ALJ relied for his decision.

First, the ALJ relied on the vocational expert's testimony that the work was sedentary, which was limited to the job as generally performed. Second, he referred to the DOT as consistent with a finding that she could perform her past work.[7] The DOT is used to define the requirements of jobs as "*usually* performed," which may vary from specific former jobs. SSR 82-61. The record and the ALJ's decision makes clear that the reference to Plaintiff's past work "as actually performed" was nothing more than a misstatement. His ultimate conclusion, which he reiterated more than once, is that Plaintiff could perform her past relevant work.

---

[7] Plaintiff also argues the ALJ erred in stating that the vocational expert's testimony was based on the DOT, because the expert stated she did not have the DOT code for substance abuse counselor and there is no precise DOT classification for a substance abuse counselor in a prison setting. The expert merely stated that she did not have the DOT number for the job of substance abuse counselor, not that her testimony was inconsistent with it regarding the physical exertion level of the job. Further, the Court's discussion is based only on Plaintiff's past work as a substance abuse counselor (non-corrections); therefore, the lack of a DOT classification for a substance abuse counselor/corrections officer is irrelevant.

If the ALJ had been silent on whether his decision was based on past work as actually performed or as generally performed, the Court would uphold the decision if either conclusion was supported by substantial evidence. *See Pinto*, 249 F.3d at 845. Here, where the ALJ mis-cited one of two disjunctive options as the basis for his decision, and there is substantial evidence to support his ultimate conclusion, the Court will uphold the ALJ's decision. Remand to correct what appears to be nothing more than a clerical error is not warranted when the record is fully developed and further administrative proceedings would serve no purpose. *Cf. Schneider v. Commissioner of Soc. Sec. Admin.*, 223 F.3d 968, 976 (9th Cir. 2000) (awarding benefits rather than remanding for further proceedings because when evidence is properly credited it is clear claimant is disabled).

Finally, Plaintiff made many alternative arguments as part of this claim, regarding other past work, including substance abuse counselor/corrections officer, pizza deliverer and substitute teacher. Because the Court finds the ALJ's decision regarding Plaintiff's past relevant work as a substance abuse counsel (non-corrections) is supported by substantial evidence, it does not reach these additional arguments.

## CONCLUSION

The Court concludes the ALJ's findings are supported by substantial evidence and there is no basis for reversing or remanding his decision. Therefore, Plaintiff is not entitled to relief and her appeal is denied.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Dkt. 14) is **DENIED**. **IT IS FURTHER ORDERED** that Plaintiff's case is **DISMISSED** and the Clerk of Court shall enter judgment.

DATED this 1st day of March, 2010.

D. Thomas Ferraro
United States Magistrate Judge